**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION**

LOUIS WILBUR CARLOCK, Jr.,   )
   )
      Plaintiff,   )
   )
     v.   )   No. 16-cv-3316
   )
NANCY BERRYHILL,   )
Acting Commissioner of   )
Social Security   )
   )
      Defendant.   )

## OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Louis Wilbur Carlock, Jr., appeals from the denial of his application for Social Security Disability Insurance Benefits (DIB) under Title II and Supplemental Security Income (SSI) under Title XVI of the Social Security Act (collectively Disability Benefits).  42 U.S.C. §§ 416(i), 423, 1381a and 1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c). Carlock filed a Motion for Summary Judgment denominated Plaintiff's Brief (d/e 32).  The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 36).  The parties consented to proceed before this Court.  <u>Consent to the Exercise of Jurisdiction by a United States Magistrate Judge and Reference Order entered May 18, 2018 (d/e 27)</u>.  For the reasons set forth below, the Defendant

Commissioner's Motion for Summary Affirmance is ALLOWED, Plaintiff

Carlock's Motion for Summary Judgment is DENIED, and the decision of

the Commissioner is AFFIRMED.

## STATEMENT OF FACTS

Carlock was born on November 5, 1974.  He secured a GED in 1994.

He previously worked as a carpenter and construction worker.  He last

engaged in substantial gainful activity in August 2010.  He suffers from

degenerative joint disease of the left shoulder, asthma, mild cardiomegaly,

GERD, right renal tumor status post nephrectomy, headaches, bipolar

disorder, depression, and anxiety disorder.  Certified Transcript of

Proceedings before the Social Security Administration (d/e 22 and 28) (R.),

at 19, 20, 32, 440.

Carlock previously applied for Disability Benefits in 2009.  He alleged

he became disabled on August 12, 2009.  R. 386.  The application was

denied on initial review on December 2, 2009.  R. 423.[1]  Carlock had

returned to work in August 2009, and worked until August 20, 2010.  R.

428.  Carlock filed the current application on September 14, 2011.  He

---

[1] The parties do not cite any evidence in the record indicating whether Carlock sought further review of
the first application.

alleged in this application that he became disabled on August 9, 2011 (Onset Date).  R. 422, 439.

Carlock had a concussion in 1986 from a bicycle accident.  In 2003, he complained of lower back pain.  An MRI of his lumbar and sacral spine was negative.  In 2008, an MRI of his right shoulder indicated bursitis, but no rotator cuff tear.  In October 2009, he was admitted to the hospital with left lumbar pain with nausea.  A tumor on his right kidney was found.  R. 842.  On October 21, 2009, Dr. Jeffrey Canham, M.D. performed a segmental nephrectomy on Carlock to remove a cancerous tumor from his right kidney.  R. 771-72.

On April 30, 2009, Carlock saw Dr. Urbano Dauz, M.D.  Carlock reported severe headaches, sweating, dizziness, and fatigue. He also reported being very forgetful.  Dr. Dauz' handwritten examination notes are largely illegible.  R. 788. [2]

On October 24, 2009, Carlock underwent a chest x-ray.  The x-ray indicated mild cardiomegaly.[3]  The x-ray was consistent with the findings of a September 2, 2009 CT scan.  R. 727.

---

[2] Carlock's initial reports of symptoms to Dr. Dauz' office are written in a different handwriting than the examination notes.  The initial reports of symptoms are generally legible.  The handwritten examination notes are largely illegible.

[3] Cardiomegaly is the medical term for an enlarged heart. See www.mayoclinic.org/diseases-conditions/enlarged-heart/symptoms-causes/syc-20355436, viewed March 13, 2018.

On November 15, 2009, Carlock was admitted to Shelby Memorial Hospital with chest pains and drenching sweats.  Cardiac enzyme tests and EKG showed that he did not have a heart attack.  A CT scan of the lungs showed no evidence of pulmonary embolism.  An echocardiogram was negative.  On November 17, 2009, Carlock saw Dr. Brian Miller, M.D., for a cardiology consultation while still in the hospital.  R. 885-87.  On examination, Carlock denied joint stiffness, pain, numbness, or weakness of the extremities.  The neurological examination was normal.  Dr. Miller could not determine the cause of Carlock's pains and sweats.  He prescribed a statin for high LDL cholesterol and recommended an outpatient stress test.  R. 885-86.

On February 19, 2010, Carlock saw Dr. Dauz.  Carlock complained of "anxiety attacks off & on".  Carlock also complained of a headache.  R. 786.  On March 30, 2010, Carlock told Dr. Dauz that he was having more anxiety attacks.  R. 785.

On May 13, 2010, Carlock saw nurse practitioner Cindy Rich, APN CNP, at the Cowden Medical Clinic, LLC, complaining of a rash. On examination, Carlock had a steady gait, no muscle atrophy, full range of motion in his joints, and even muscle tone and strength.  His neurological examination was normal.  The psychiatric examination showed Carlock to

be fully oriented with normal judgment and insight, no suicidal or homicidal ideations, appropriate mood and affect, and intact recent and remote memory.  R. 1053.

On June 29, 2010, Carlock reported to Dr. Dauz that he was tired.  R. 785.

On January 24, 2011, Carlock saw Dr. Canham for a re-check after the segmental nephrectomy.  R. 764-66.  Carlock reported that he was more tired than usual.  He said that he needed more sleep, including afternoon naps.  Carlock denied any pain.  The examination was unremarkable.  Carlock's gait and station were normal.  Carlock's mood and affect were normal.  Dr. Canham stated he would order an MRI of the abdomen "at the 1+ year point following nephrectomy,"[4] and reevaluate Carlock's condition at that time.  R. 766.

On June 11, 2011, Carlock underwent x-rays of his lumbar spine. The x-rays showed a slight curve probably due to muscle spasm, a "tiny marginal spur" on the L4 vertebra, and an oval calcific density over the left iliac bone that could be a benign bone island.  The impression was, "No significant lumbosacral spine abnormality."  R. 800, 838.

---

[4] Nephrectomy is surgery to remove a kidney or part of a kidney.  See www.mayoclinic.org/tests-procedures/nephrectomy/about/pac-20385165, viewed March 13, 2018.

On June 21, 2011, Carlock saw Dr. Dauz.  Carlock reported having headaches every morning when he got up from bed.  Carlock reported that the headaches lasted all day.  Carlock reported that he could not sleep due to back pain and headaches.  Dr. Dauz' handwritten examination notes are largely illegible.  R. 783.

On September 13, 2011, Carlock underwent a check x-ray.  The x-ray showed that his heart size was at the upper limits of normal and unchanged from December 10, 2010.  The impression was no active cardiopulmonary disease identified and unchanged from the December 10, 2010 examination.  R. 837.

On October 25, 2011, Carlock saw Dr. Dauz.  Carlock reported having headaches once a month, lightheadedness, and nausea.  Carlock reported that these problems were getting worse.  Dr. Dauz referred Carlock to a neurologist, Dr. Rana H. Mahmood, M.D. R. 781.  On October 26, 2011, Carlock underwent a head CT scan.  The results were unremarkable.  R. 968.

On November 2, 2011, Carlock saw Dr. Mahmood for a neurological consultation.  Dr. Dauz referred Carlock for the consultation.  R. 1078-79.  Carlock reported daily headaches.  He reported that a recent CT of his head was unremarkable.  Carlock reported no fatigue, frequent or severe

headache, loss of memory, confusion, or dizziness. Carlock also reported no pain or tiredness in legs while walking; no leg discomfort; and no lower extremity pain, numbness or tingling. R. 1078. Carlock reported drinking six pots of coffee per day. Carlock reported that he smoked cigarettes for the last 20 years. On examination, Carlock had normal strength, reflexes, coordination, and gait. R. 1079. Dr. Mahmood assessed migraines without aura, with "some element of confusional migraine as well as trouble concentrating and fogginess of mind." Dr. Mahmood prescribed Depakote and ordered an electroencephalogram (EEG). Dr. Mahmood recommended that Carlock reduce his caffeine intake. R. 1079. Dr. Mahmood indicated that reducing caffeine intake could reduce his headaches. The EEG study showed normal results. R. 1080.

On November 29, 2011, Carlock saw Dr. Vittal Chapa, M.D., for a consultative examination. R. 901-05. Carlock reported decreased strength in his upper body. He reported that he could not do his prior work because he got tired and had to sit down frequently. Carlock reported having anxiety attacks. Carlock reported that he had migraine headaches. He reported that he took medicine daily for the headaches, which helped. R. 901.

On examination, Dr. Chapa observed that Carlock's gait was normal. The neurological examination was normal. Reflexes were normal. Dr. Chapa saw no evidence of joint redness, heat, swelling, or thickening. Carlock's handgrip was 5/5 bilaterally. Carlock could perform fine and gross manipulations with both hands. Carlock's lumbar flexion was normal. Straight leg raising tests were negative bilaterally. Carlock had full range of motion in his joints. Dr. Chapa assessed right kidney cancer in remission, asthma, and hypertension. 902-03. Dr. Chapa stated that the physical examination was unremarkable. R. 903.

On December 13, 2011, state agency physician Dr. Sandra Bilinsky, M.D., prepared a Physical Residual Functional Capacity Assessment of Carlock. R. 913-20. Dr. Bilinsky opined that Carlock could lift 50 pounds occasionally and 25 pounds frequently; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; had unlimited ability to push and pull. Dr. Bilinsky opined that Carlock should avoid concentrated exposure to fumes, odors, gases, and poor ventilation. Dr. Bilinsky opined that Carlock had no other physical functional limitations. R. 915-19.

On the same day, December 13, 2011, psychologist Dr. Jerry L. Boyd, Ph.D., performed a consultative psychological evaluation of Carlock.

R. 907-11. Carlock reported depression and anxiety for the prior two to three years, which coincided with his cancer diagnosis. Carlock reported that he had no history of mental health treatment and took no psychotropic medications. Carlock said he was retained in kindergarten, and his education included special education and learning disability classes in spelling and reading. He reported that he secured a GED. R. 907. Carlock reported no insomnia with decreased energy levels. R. 909.

Carlock reported that he went to bed between 9:00 and 10:00 p.m., and awoke at 6:30 a.m. During the day, he checked the mail, watched television, and assisted with childcare. Carlock said that he also shopped. Carlock said he bathed every other day. R. 910.

Carlock reported that his anxiety symptoms felt like a heart attack. He said that he had trouble breathing and his chest hurt. Carlock reported that he had anxiety attacks about once a week. He said he had anxiety attacks "If we have to go anywhere." R. 910.

On examination, Dr. Boyd found that Carlock's attention, concentration, and short-term memory showed mild impairment. His remote memory was intact. Dr. Boyd opined that Carlock's intelligence was in the low normal range; his judgment and maturity were slightly below age level; and his insight was fair. Carlock's thought processes were normal.

Dr. Boyd found no indication of psychosis. Carlock's mood and affect were "grouchy." Carlock rated his shoulder pain as a 4 on a 10 scale. Dr. Boyd observed that Carlock's gait was normal. R. 908, 910.

Dr. Boyd assessed Carlock with panic disorder with social features, and major depressive disorder. Dr. Boyd assigned a Global Assessment of Functioning (GAF) score of 55. Dr. Boyd indicated that the GAF score of 55 represented Carlock's status at the time of the examination and his highest score during the preceding year. R. 910.

A GAF score is an assessment of the severity of the person's symptoms or functional limitations at a given point in time. A GAF score from 41 to 50 indicates serious symptoms or serious functional limitations. A score from 51 to 60 indicates moderate symptoms or moderate functional limitations. Diagnostic and Statistical Manual of Mental Disorders (4th ed. Text Rev. 2000) (DSM-IV-TR), at 32-34. The American Psychiatric Association no longer recommends use of GAF scores. Diagnostic and Statistical Manual of Disorders (5th ed. 2013) (DSM-5), at 16.

Dr. Boyd concluded that Carlock appeared to have reduced stress tolerance, reduced stamina, and anxiety particularly for novel or highly interpersonal settings. Dr. Boyd said that Carlock appeared to have

reduced persistence in association with his depression and anxiety.  R. 910.

On December 21, 2011, state agency psychologist Dr. Joseph Mehr, Ph.D., prepared a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment.  R. 919-37.  Dr. Mehr opined that Carlock suffered from major depressive disorder and panic disorder with social features.  R. 924, 926.  Dr. Mehr opined that Carlock was moderately limited in his ability to understand, remember, and carry out detailed instructions, but was not otherwise functionally limited by his mental impairments.  R. 935-37.  Dr. Mehr opined that Carlock had the cognitive ability to remember general work procedures, and to understand and remember instructions for simple tasks of a routine and repetitive type.  He also opined that Carlock had the attention and concentration necessary to persevere at and complete those operations for a normal workday.  Dr. Mehr opined that Carlock had limited social tolerance but could relate appropriately in low stress situations away from the general public. Dr. Mehr opined that Carlock could adapt to simple changes in daily routines. R. 937.

On February 21, 2012, Carlock went to the Shelby County Community Services (SCCS) for a comprehensive mental health

assessment.  R. 990-1016.  He saw mental health professional Debra Porter, BS, QMHP.  R. 1016.[5]  Carlock stated that he perceived his mental problems to be of mild severity.  R. 993.  Porter assessed major depression disorder, recurrent, moderate and generalized anxiety disorder.  Porter assigned a GAF score of 59.  R. 1016.  On February 28, 2012, Carlock saw Porter again.  Carlock and Porter signed a Mental Health Treatment Plan on February 28, 2012.   R. 986-89.  Porter reiterated her assessment of Carlock, including the GAF score of 59.  R. 989.

On March 9, 2012, Carlock saw SCCS psychiatrist Dr. Choudary Kavuri, M.D., for an initial psychiatric evaluation.  Dr. Kavuri assessed major depressive disorder and generalized anxiety disorder.  Dr. Kavuri prescribed Celexa.  R. 985.  Carlock did not return to SCCS for further treatment or counseling.  R. 983-94.

On April 9, 2012, state agency psychologist Dr. Phyllis Brister, Ph.D., reviewed Dr. Mehr's opinions on reconsideration and affirmed them.  On April 11, 2012, state agency physician Dr. C.A. Gotway, M.D., reviewed Dr. Bilinsky's opinions on reconsideration and affirmed them.  R. 970-71.

---

[5] The signature block on the form indicates that Porter has a MA degree.  Porter signed a GAF Rating Estimate Tool and Mental Health Treatment Plan on February 28, 2012.  She indicated after her signature that she had a BS degree.  R. 986, 989.  The Court uses BS because Porter wrote in the BS notation her own hand next to her signatures.

On or about September 24, 2012, Carlock saw nurse practitioner Cindy Rich with complaints of trouble sleeping and panic attacks. On examination, Carlock had a steady gait, no atrophy, full range of motion of the joints, even muscle tone and strength. His neurological examination was normal. The psychiatric examination showed Carlock to be fully oriented with normal judgment and insight, no suicidal or homicidal ideations, appropriate mood and affect, and intact recent and remote memory. R. 1049.

On September 26, 2012, Carlock saw nurse practitioner Rich with complaints of panic attacks. On examination, Carlock had a steady gait, no atrophy, full range of motion of the joints, even muscle tone and strength. His neurological examination was normal. The psychiatric examination showed Carlock to be fully oriented with normal judgment and insight, no suicidal or homicidal ideations, appropriate mood and affect, and intact recent and remote memory. Rich assessed major depressive disorder and panic attacks. R. 1046-47.

On October 29, 2012, Carlock saw psychiatrist Dr. Khondakar Abul Hasanat, M.D. R. 974-77. Carlock reported problems with anger and depression. Carlock reported tiredness, isolation, and poor sleep. Carlock said he stayed in his room watching television. He yelled at the children

easily.  He said "he retreats to his 'little comfort zone' where he does not have to interact" with others.  He said he had panic attacks once a week. He took Xanax about once a week for panic attacks.  He took more when he left his home.  Carlock said that the Xanax helped with the panic attacks.  Depakote did not help anger problems.  He reported the Depakote was for his headaches.  Dr.  Hasanat assessed major depression single— moderate and panic disorder, major single—moderate.  Dr. Hasanat assigned a GAF score of 55.  R. 976.  Dr. Hasanat prescribed Paxil. R. 977.

On December 11, 2012, Carlock saw nurse practitioner Rich with complaints of fatigue and back pain.  Carlock reported that he had migraine headaches.  On examination, Carlock had a steady gait and even muscle tone and strength.  Rich noted decrease range of motion in Carlock's lower spine.  His neurological examination was normal.  The psychiatric examination showed Carlock to be fully oriented with normal judgment and insight, no suicidal or homicidal ideations, appropriate mood and affect, and intact recent and remote memory.  Rich assessed lower back pain and fatigue.  R. 1042.

On December 12, 2012, Carlock underwent an x-ray of his lumbar spine.  The x-rays showed spondylosis in the lower thoracic and upper and

mid lumbar spine, facet joint hypertrophy in the upper, mid, and lower levels of the lumbar spine, and a mild levoscoliosis of the mid lumbar spine. The x-rays showed a sclerotic focus in the left iliac bone, consistent with a bond island.  The radiologist compared the x-rays with the ones taken on June 21, 2011.  The x-rays showed no change from June 2011.  R. 1066.

On December 18, 2012, Carlock saw nurse practitioner Rich.  On examination, Carlock had a steady gait, no muscle atrophy, full range of motion in his joints, and even muscle tone and strength.  His neurological examination was normal.  The psychiatric examination showed Carlock to be fully oriented with normal judgment and insight, no suicidal or homicidal ideations, appropriate mood and affect, and intact recent and remote memory.  Rich assessed hypertension, bronchitis, and sinusitis.  She prescribed Lisinopril for the hypertension and an antibiotic for the bronchitis and sinusitis.  R. 1040.

On January 9, 2013, Carlock saw nurse practitioner Rich for a medication follow-up.  R. 1037-38.  Carlock reported that Paxil helped slow his anxiety, but he still had anger issues.  Carlock reported that he was not as anxious and did not need to take anxiety medication as often.  Carlock reported that his anger problems had gotten worse.  He reported that he stayed at home, slept a lot, and was always tired and depressed.  R. 1037.

On examination, Carlock's gait was normal, and he had even muscle tone, full range of motion, and even muscle strength. The cardiovascular and neurological examination was normal. The psychiatric examination showed Carlock to be fully oriented with normal judgment and insight, no suicidal or homicidal ideations, appropriate mood and affect, and intact recent and remote memory. Rich noted depression and bipolar disease. Rich prescribed Effexor and discontinued the Paxil prescription. R. 1038.

On January 29, 2013, Dr. John Opilka, D.O., of the Cowden Medical Clinic completed a form entitled Mental Impairment Questionnaire (Listing). R. 1018-21. Dr. Opilka stated that Carlock had been a patient of Cowden Medical Clinic since May 13, 2010. Dr. Opilka opined that Carlock suffered from major depressive disorder, anxiety disorder, and bipolar disorder. Dr. Opilka assigned a current GAF score of 40. Dr. Opilka opined that Carlock's highest GAF score in the previous 12 months was 50. Dr. Opilka described the clinical findings on which he based his opinions was a mini mental status examination of 30 points that was within normal limits and a bipolar questionnaire that was positive for bipolar disorder. R. 1018. Dr. Opilka opined that Carlock had marked restrictions on activities of daily living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence or pace, and four or

more episodes of decompensation within the previous 12 months, each of which lasted for at least two weeks.  R. 1020.

Dr. Opilka opined that Carlock would miss at least four days per month at work due to his mental impairments.  Dr. Opilka opined that Carlock could not manage benefits in his own best interest, "because cannot live independently of parents with wife and 2 children.  Cannot hold a job—no way to make money.  Sleeps a lot!!"  R. 1021.

On the same day, January 29, 2013, nurse practitioner Rich of the Cowden Medical Clinic administered a form with the preprinted title of "The Mood Disorder Questionnaire."  R. 1022-23.  Rich added to the title "+ Bipolar Disorder."  Rich determined Carlock had a score of 30 points on the form.  The form stated that a score above 26 indicated "normal cognitive function."  R. 1023.

 On August 28, 2013, Dr. Boyd conducted another consultative psychological examination.  Carlock reported that he had suffered from depression for 10 years, dating back to the death of his fiancé.  Carlock reported that he went to the Shelbyville Community Counseling Service for mental health counseling.  He also reported taking Venlafaxine and Xanax.  Carlock said the medications helped some, but made him tired.  Carlock

said he quit school after the 11th grade. He was retained in kindergarten and attended learning disability classes for spelling. R. 1088.

On examination, Carlock was fully oriented. He showed mild impairment to attention, concentration, and short-term memory. His remote memory was intact. His intelligence was in the normal range. His judgment and maturity were slightly below age level, and his insight was superficial. His thought processes were normal with no sign of psychosis. His mood and affect were depressed. R. 1089-90.

Carlock said that during the day he poured cereal for his children's breakfast and got them off to school. He watched television and used the computer for Facebook. R. 1090.

Carlock reported pain in the side of head. He said the pain was a 9 on a 10 scale. Carlock said he experienced panic attacks about once a month when he left home to go somewhere. He said the panic attacks felt like a heart attack. He said his chest hurt, he had trouble breathing, and he sweated. R. 1091.

Dr. Boyd assessed major depressive disorder and anxiety disorder with social features. Dr. Boyd assigned a GAF score of 50. Dr. Boyd concluded:

> This examination of Louis Carlock indicates the presence of depressive and social anxiety symptoms in a man who reported

the mental and physical inability to meet the demands of employment. He appears to be of average intelligence and can follow moderately complex instructions. Mild memory for digits was measured in this [examination]. He is an adequate communicator, but he has diminished affect. Further, the Claimant appears to have a reduced stress tolerance, particularly for novel or highly interpersonal settings. The Claimant does appear to be of reduced persistence in association with his depression, chronic pain and anxiety. He has come to avoid others as well as any away from home situation that he can avoid. When he cannot avoid, he becomes anxious, sweaty, and wants to return home.

R. 1091.

Dr. Boyd also completed a form entitled Medical Source Statement of Ability to do Work-Related Activities (Mental). R. 1093-95. Dr. Boyd opined that Carlock was not limited in his ability to understand, remember, and carry out simple instructions. Dr. Boyd opined that Carlock also had no limitations in his ability to make judgments on simple work-related decisions. He opined that Carlock was moderately limited in his ability to understand, remember, and carry out complex instructions; and moderately limited in his ability to make judgments on complex work-related decisions. R. 1093. Dr. Boyd opined that Carlock was moderately limited in his ability to interact appropriately with the public, supervisors, and co-workers; and moderately limited in his ability to respond appropriately to usual work situations and to changes in routine work settings. R. 1094. Dr. Boyd

opined that Carlock's mental impairments did not affect any of Carlock's other capabilities.  R. 1094.

On February 11, 2014, Carlock saw Dr. Fatima Alao, M.D., for a neurological consult.  Carlock complained of severe migraine headaches, tension headaches, and rebound headaches.  Carlock stated that he was trying to get disability.  He stated that he did not need any help with activities of daily living.  He said usually he did not drive because he got confused.  On examination, Dr. Alao found no tenderness in the spine or paraspinal areas and no scoliosis/kyphosis.  The mental status examination showed good attention and comprehension, and good judgment and insight.  R. 1182.  Carlock had full strength bilaterally and normal muscle bulk and tone.  Carlock's posture and gait were normal.  Reflexes were 2+ and symmetric.  R. 1183.  Dr. Alao assessed migraine headaches without aura, tension headaches, and rebound headaches.  Dr. Alao changed Carlock's prescription medication.  Dr. Alao told Carlock not to take Naproxen more than three times per week.  R. 1184.

On February 14, 2014, Carlock underwent an MRI of his brain.  The MRI showed a suspect 4 mm pituitary microadenoma on the left side of the pituitary with no evidence of pituitary macroadenoma, with pituitary stalk in

the midline and unremarkable optic chasm. The MRI was otherwise negative. R. 1217 (27F).

On March 7, 2014, Carlock saw Dr. Alao for a follow up visit. R. 1174-77. Carlock reported that he still had headaches. Carlock reported taking at least six Excedrin Migraine tablets per day. R. 1174-75. Dr. Alao noted that the headaches were most likely rebound headaches and Carlock needed to stop taking over-the-counter medications for headaches. R. 1175.

On examination, Carlock had good attention and comprehension, and good judgment and insight. Carlock's muscle bulk and tone were normal. His strength was full bilaterally. His posture and gait were normal. His reflexes were 2+ and symmetric. Dr. Alao continued her prior prescriptions and told Carlock to discontinue using over-the-counter medication for headaches, especially Excedrin. R. 1177.

On April 17, 2014, Carlock saw Dr. Alao for a follow up. R. 1169-72. Carlock reported still having bad migraine headaches. He reported that the headaches were better after he stopped taking over-the-counter medications. The frequency of headaches went down from four to five per week to three per week. R. 1170. On examination, Carlock had good attention and comprehension, and good judgment and insight. Carlock's

muscle bulk and tone were normal.  His strength was full bilaterally.  His posture and gait were normal.  His reflexes were 2+ and symmetric.  R. 1171.  Dr. Alao increased Carlock's prescription medications.  R. 1172.

On March 25, 2015, the Administrative Law Judge (ALJ) conducted an evidentiary hearing.  R. 42-76.  The ALJ had conducted a previous hearing on July 2, 2013.  Carlock testified in the 2013 hearing that he went to the Cowden Medical Clinic for his primary medical care.  He said he primarily saw nurse practitioner Rich about once a week for his care.  He said he saw Dr. Opilka once or twice.  R. 91.  The ALJ issued a decision on October 25, 2013 finding that Carlock was not disabled.  R. 123-48.  The Appeals Council remanded the case to the ALJ for further proceedings.  On November 14, 2014, the Appeals Council remanded the case for further proceedings including an additional hearing.  R. 149-52.  Thereafter, the ALJ conducted the March 25, 2015 hearing.

Carlock appeared at the March 25, 2015 hearing with his attorney.  Carlock's wife also appeared and testified.  Vocational expert Dr. Mathew Sprong, Ph.D., also appeared.  At the beginning of the hearing, Carlock's attorney confirmed Carlock alleged an Onset Date of August 9, 2009.  R. 48; see R. 277-78 (Dr. Sprong's curriculum vitae).

Carlock testified that he, his wife, and three of their children lived with Carlock's parents. Carlock testified that he helped get his children ready for school, and drove them to school once or twice a week. He testified that otherwise he slept most of the day. During his waking hours, he looked at Facebook on the computer and drove to the mailbox to get the mail. He said that his wife did the housework. R. 50-55.

Carlock said he left the house when his wife made him. He did not like to leave the house. R. 56-57. He said he came to the hearing because he wife made him. He said that he had an anxiety attack the night before the hearing. R. 59-60. Carlock's wife testified consistently with her husband. R. 66-69.

Vocational expert Dr. Sprong then testified. The ALJ asked Dr. Sprong the following hypothetical question:

> What I'd like to do now is ask you some hypothetical questions and please disregard any information you may have gathered from reading the file or listening to the testimony other than that which I give in the hypothetical. Assume the past work activity the same as the claimant's, exertional capacity limited to light work, no climbing of ladders, ropes, or scaffolds, other postural functions performed occasionally, occasional overhead reaching, other manipulative functions can be performed frequently, a need to avoid environmental hazards such as unprotected heights and dangerous machinery, need to avoid concentrated exposure to pulmonary irritants, a limitation to the performance of simple and repetitive tasks that would involve little or no change in work routine, and no interaction with the

> public, occasional interaction with co-workers and supervisors.
> Of course the past work would be precluded, right?

R. 69-70.  Dr. Sprong agreed that such a person could not perform

Carlock's prior work.  R. 70.  The ALJ then asked:

> So if we now add the vocational factors by assuming that the
> hypothetical individual is of the claimant 's age, and education,
> and work history, in your opinion would there be any unskilled,
> light, or sedentary work that such an individual could perform?

R. 71.  Dr. Sprong opined that such a person could work the following jobs:

mail clerk, with 72,700 such jobs in the nation, and 3,700 in Illinois; a

routing clerk, with 77,800 such jobs in the nation, and 3,600 in Illinois;

assembly machine tender, with 35,600 such jobs in the nation and 2,600 in

Illinois; addresser, with 25,800 such jobs in the nation and 730 in Illinois;

and surveillance system monitor, with 17,200 such jobs in the nation and

620 in Illinois.  R. 71.  Dr. Sprong opined that the person described could

only perform half of the surveillance system monitory jobs because many of

those jobs involve frequent contact with co-workers and supervisors.  R.

71-72.  Dr. Sprong said these jobs represented the types of jobs the person

could perform.  R. 71.

Dr. Sprong opined that a person in these jobs could be absent from

work once a month and would need to stay on task 90 percent of the time

during the workday.  R. 72.  Dr. Sprong opined that the person could only

take a 30-minute lunch break and two 15-minute breaks during the
workday.  The person could take at the most one additional five-minute
break.  R. 74.

THE DECISION OF THE ALJ

On May 11, 2015, the ALJ issued his decision.  The ALJ followed the
five-step analysis set forth in Social Security Administration Regulations
(Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the
claimant not be currently engaged in substantial gainful activity.  20 C.F.R.
§§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a
severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3
requires a determination of whether the claimant is so severely impaired
that he is disabled regardless of his age, education and work experience.
20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3,
the claimant's condition must meet or be equal to the criteria of one of the
impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1
(Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so
severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work
considering his age, education, work experience, and Residual Functional
Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If

the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c). The claimant has the burden of presenting evidence and proving the issues on the first four steps. The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy. 20 C.F.R. §§ 404.1512, 404.1560(c); <u>Weatherbee v. Astrue</u>, 649 F.3d 565, 569 (7th Cir. 2011); <u>Briscoe ex rel. Taylor v. Barnhart</u>, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found at Step 1 that Carlock had not engaged in substantial gainful activity since August 2010. At Step 2, the ALJ found that Carlock suffered from the severe impairments of degenerative joint disease of the left shoulder, asthma, mild cardiomegaly, GERD, right renal tumor status post nephrectomy, headaches, bipolar disease, depression, and anxiety disorder. R. 20-21. The ALJ determined at Step 3 that Carlock's impairments or combination of impairments did not meet or medically equal any Listing. R. 21-27.

At Step 4, the ALJ found that Carlock had the following RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: he cannot climb ladders, ropes, or scaffolds; he can occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; he can do no overhead reaching; he can frequently reach in all other directions, handle, finger, and feel; he needs to avoid environmental hazards; he needs to avoid concentrated exposure to pulmonary irritants; he is limited to simple and repetitive tasks involving little or no change in work routine; he can have no interaction with the general public; and he can have occasional interaction with coworkers and supervisors.

R. 27-28. The ALJ relied on the consultative examinations of Drs. Chapa and Boyd; the opinions of agency physicians and psychologists Bilinsky, Gotway, Mehr, and Brister; the numerous medical examination notes from Drs. Chapa, Canham, and Alao, and from nurse practitioner Rich, that found full range of motion, even muscle tone, even muscle strength, normal strength, and normal reflexes; the examination notes of Rich and Dr. Alao that found normal judgment and insight, intact recent and remote memory, and good attention and comprehension; and the SCCS evaluation that indicated mild mental problems. The ALJ gave significant weight to the opinions of Dr. Boyd in his Medical Source Statement. R. 27-32, 1093-95.

In making the RFC finding, the ALJ accorded little weight to Dr. Opilka's opinions and no weight to Dr. Dauz' opinions. The ALJ found that

Dr. Opilka's opinions on mental limitations were not supported by the treatment notes by his own Cowden Medical Clinic, as well as the opinions of Drs. Boyd, Mehr, and Brister. The ALJ noted that Dr. Opilka relied on Carlock's mini mental examination that was within normal limits. The ALJ found that Dr. Opilka's opinions of Carlock's physical limitations were not supported by the Cowden Medical Clinic records that generally showed full range of motion and even muscle tone and strength. The ALJ noted that Rich was Carlock's primary treating healthcare professional, not Dr. Opilka. The ALJ also noted that Dr. Opilka was not a mental health specialist. R. 30.

The ALJ gave no weight to Dr. Dauz' opinions. The ALJ found that Dr. Dauz' treatment notes indicate that his treatment of Carlock did not concern mental issues. He also was not a mental health specialist. Finally, the ALJ noted that Dr. Dauz' opinions conflicted with the contemporaneous opinion of mental health professional Porter of the SCCS evaluation who assigned a GAF score of 59 to Carlock. R. 30.

After determining Carlock's RFC, the ALJ found that Carlock could not perform his past relevant work. R. 32. The ALJ said that the requirements of his past work in construction exceeded the limitations in the RFC. R. 32.

At Step 5, the ALJ found that Carlock could perform a significant number of jobs that exist in the national economy. The ALJ considered Carlock's age, education, experience, RFC; along with the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, the opinions of Dr. Sprong. The ALJ found that Carlock could perform the representative jobs of mail clerk, routing clerk, and assembler. The ALJ concluded that Carlock was not disabled. R. 32-33.

Carlock appealed. On September 20, 2015, the Appeals Council denied his request for review. The decision of the ALJ then became the final decision of the Defendant Commissioner. R. 1. Carlock then brought this action for judicial review.

ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision. Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment or reweigh the evidence. Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). This Court will not review the ALJ's

evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2016 WL 1119029, at *1 (2016) (The Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms).  The ALJ must articulate at least minimally her analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ's decision is supported by substantial evidence.  The RFC finding is supported by the numerous treatment notes that generally found normal strength, full range of motion, normal mood, normal judgment and insight, and intact memory.  The RFC is also supported by the opinions of Drs. Chapa, Bilinsky, and Gotway, as well as psychologists Drs. Boyd, Mehr, and Brister.  Dr. Boyd opined that Carlock generally had moderate limitations.   Psychiatrist Dr. Hasanat opined that Carlock had a GAF of 55 and SCCS mental health professional Porter assigned a GAF of 59, both of which concur with Dr. Boyd's opinions that Carlock had moderate mental

limitations.  Dr. Boyd opined that with his mental limitations, Carlock could understand, remember, and follow simple instructions and had the ability to make judgments on simple work-related decisions.  Drs. Mehr and Brister opined that Carlock could remember general work procedures; understand and remember instructions for simple tasks of a routine and repetitive type; and had the attention and concentration to persevere and complete those operations in a timely manner.  All this evidence supports the ALJ's RFC finding.  The RFC finding and the opinions of Dr. Sprong supported the finding at Step 5 that Carlock was not disabled.

Carlock argues that the ALJ erred in giving little and no weight to the opinions of Drs. Opilka and Dauz.  The ALJ must give the opinions of a treating physician controlling weight if the opinions are supported by objective evidence and are not inconsistent with other evidence in the record.  20 C.F.R. § 404.1527(d)(2); Bauer v. Astrue, 532 F.3d 606, 608 (7th Cir. 2008).[6]  Substantial evidence supported the ALJ's finding that the opinions of Drs. Opilka and Dauz were not supported by objective evidence and were inconsistent with other evidence in the record.  Dr. Opilka opined

---

[6] The Commissioner recently changed the regulations regarding the interpretations of medical evidence. The amendments, however, apply prospectively to claims filed on or after the amendment's effective date of March 27, 2017. Revisions to Rule Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, at 5844-45 (January 18, 2017).  As such, the amendments do not apply here.

that Carlock had a GAF of 40, indicating severe symptoms or functional limitations. Dr. Opilka stated that he based that opinion on a Mini Mental Status Examination that was within normal limits. He also stated that he relied on a bipolar questionnaire performed by his associate nurse practitioner Rich on the same day that showed Carlock was functioning normally. Rich's treatment notes generally showed normal mental status with normal judgment and insight, no suicidal or homicidal ideations, appropriate mood and affect, and intact recent and remote memory. Carlock cites to no treatment notes by Dr. Opilka because he did not treat Carlock. Carlock testified he primarily saw nurse practitioner Rich about once a week, but only saw Dr. Opilka once or twice. R. 91. Dr. Opilka's mental opinions are also inconsistent with the findings of psychiatrist Dr. Hasanat, psychologists Drs. Boyd, Mehr, and Brister, and the GAF finding of mental health professional Porter at SCCS.

Dr. Opilka's opinions on physical limitations are also inconsistent with Rich's treatment notes, as well as the treatment notes of Dr. Alao and Canham, and with Dr. Chapa's examination. These records all find generally normal strength and range of motion, except for Carlock's shoulder. Dr. Opilka's opinions are also inconsistent with the findings of Dr. Chapa and the opinions of Drs. Bilinsky and Gotway. All of these

inconsistencies provide substantial evidence to support the ALJ's decision to not give Dr. Opilka's opinions controlling weight and to decide to give the opinions little weight.

Likewise, Dr. Dauz' opinions are not supported by objective findings in his treatment notes. Dr. Dauz' opinions are similarly inconsistent with the findings of psychiatrist Dr. Hasanat; psychologists Drs. Boyd, Mehr, and Brister; and mental health professional Porter. These inconsistencies provide substantial evidence to support the ALJ's decision to not give Dr. Dauz' opinions controlling weight and to give them no weight.

Carlock also argues that the ALJ's RFC was not supported by substantial evidence because the RFC did not incorporate Dr. Boyd's findings of moderate mental impairments. The hypothetical question must include all material functional limitations and be supported by the record. Lanigan v. Berryhill, 865 F.3d 558, 653 (7th Cir. 2017). The ALJ relied on the opinions of the vocational expert Dr. Sprong. Carlock argues that the hypothetical question posed to Dr. Sprong failed to include consideration of Carlock's functional limitations due to his mental condition. Carlock argues that the questions to Dr. Sprong that assumed an RFC provision of simple repetitive tasks involving little changes in work routine did not incorporate moderate mental limitations.

Carlock cites <u>O'Connor-Spinner v. Astrue</u>, 627 F.3d 614, 618-19 (7th Cir. 2010) to support his argument that the incorporation of simple repetitive tasks in the question to Dr. Sprong was not adequate to address Carlock's functional limitations due to his moderate mental limitations.  In <u>O'Connor-Spinner</u>, the evidence showed that the claimant had mental impairments that limited his persistence or pace.  In this case, to address this limitation, the ALJ incorporated into both the RFC and the hypothetical to the vocational expert the limitation to the performance of simple and repetitive tasks that would involve little or no change in work routine.  The Seventh Circuit in <u>O'Connor-Spinner</u> reversed because no evidence in the record supported the ALJ's conclusion that a limitation to routine repetitive tasks with simple instructions adequately addressed the claimant's functional limitations of his persistence or pace.  Id.

In this case, however, substantial evidence supported the ALJ's conclusion. The ALJ incorporated into the hypothetical question to Dr. Sprong and into the RFC a limitation to simple and repetitive tasks involving little or no change in work routine.  Dr. Boyd opined that Carlock had moderate limitations and with those limitations, he could understand and carry out simple instructions.  Drs. Mehr and Brister opined that Carlock could remember general work procedures; understand and

remember instructions for simple tasks of a routine and repetitive type; had the attention and concentration necessary to complete tasks in a timely manner.  R. 937.  Unlike the <u>O'Connor- Spinner</u> case, these opinions provided substantial evidence to support the limitations incorporated into the RFC and the hypothetical question to Dr. Sprong to address Carlock's functional limitations due to his mental impairments.  There was no error.

THEREFORE IT IS ORDERED that the Defendant Commissioner's Motion for Summary Affirmance (d/e 36) is ALLOWED; Plaintiff Louis Carlock's Motion for Summary Judgment denominated Plaintiff's Brief (d/e 32) is DENIED; and the decision of the Commissioner is AFFIRMED.  THIS CASE IS CLOSED.

ENTER:   March 13, 2018

_____*s/ Tom Schanzle-Haskins*_____
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE